ELLA A. DANA, as Administratrix, etc., Appellant, *v.* THE NEW YORK CENTRAL AND HUDSON RIVER RAILROAD COMPANY, Respondent.

*126-675.*

925 639
142 424

(Argued April 16, 1883; decided April 24, 1883.)

THIS action was brought to recover damages for alleged negligence causing the death of C. Frank Dana, plaintiff's intestate, who was killed at the same accident as was Shehan, for whose death defendant was held liable. (See *Sheehan* v. *N. Y. C. & H. R. R. R. Co.*, 91 N. Y. 332.) In this case plaintiff was nonsuited on the trial.

The opinion is given in full.

" This action is to recover damages for the death of C. Frank Dana, caused, as the plaintiff alleges, by the defendant's negligence. Upon the trial the facts in evidence were as follows: On and for sometime before August 22, 1878, Dana was in the service of the defendant as locomotive engineer, and on that day was drawing its regular freight or schedule train, No. '50' from Rochester, east to Syracuse. There was but a single track with stations at various places between these points, and among others at Cayuga and Auburn. The train was due at Cayuga at 4:45 P. M., but actually arrived at 4:30. Regular train '61' was due at Cayuga from the east at 4:35, but was

delayed. This was known to Kiefer, defendant's telegraph operator at that place, and as train '50' came in, he said to its conductor, 'orders received to hold No. 50 for 61.' The conductor repeated this to Dana. Train '61' reached Cayuga at 4:55, and train '50' immediately left for the east. After running a mile and a half, it met and collided with a 'wild cat' train, No. 337. Dana was thereby at once killed, and Shehan, fireman on '337,' was injured. Train '337' had no schedule time or place on the road, and no one upon train '50,' nor the telegraph operator at Cayuga, had reason to anticipate its coming. It was made up and set in motion by special telegraphic orders addressed at 2:50 on that day by defendant's superintendent to its conductor and engineer, then at De Witt (a station just east of Syracuse), to 'wild cat to Auburn and report.' At 4:46 the defendant's superintendent gave them a further order to 'wild cat to Cayuga regardless of No. 50.' In doing so the collision occurred.

" No doubt the intestate, at the time of entering the defendant's employment, must be deemed to have assumed the ordinary risks incident to the service, but it is equally well settled that the employers cannot avail themselves of this assent of the servant, unless they have taken reasonable precautions to insure his safety while in the performance of assigned duties. The principle, therefore, which secures this exemption has no application where the injury is traced to the employers' personal failure to take such precautions, nor where they knew of the existence of a danger of which the servant has no means of knowledge. Within these rules, therefore, a railroad corporation is bound to carry on its business under a proper and reasonable system, or regulations (*Slater* v. *Jewett*, 85 N. Y. 61; 39 Am. Rep. 627), and if, through any defect therein, an injury occurs to the servant, the corporation will be liable. It does not appear from the record that the injury complained of was not immediately due to the defendant's omission of duty in this respect, and the trial court erred in taking the case from the jury. The evidence would justify a finding that they had not taken reasonable precautions to secure the safety of their servants employed upon the train whose time was interfered with.

Upon this question it was in no respect different from that submitted to the jury in *Sheehan's Case*,* and found by their verdict to be enough. We thought it was properly submitted to them, and sustained the judgment. (See opinion of March, 1883.) That decision requires a reversal of the one now before us.

"It is claimed, however, by the learned counsel for the respondent, that Dana knew of the regulations by which trains were run by telegraph orders, and took the risk of their sufficiency. He was furnished with a copy of them. Among other things not material here, they prescribe that 'all telegraph orders must be first copied by the operator on the order-book provided for that purpose, and repeated back immediately to the dispatcher, to be sure it is correct. After receiving 'O. K.' from the dispatcher, the operator will make a copy on a blank for the persons addressed, who will, after comparing it with the book, and seeing it is correct, sign their names to the book, prefixed by the numeral '13.' The operator will transmit the '13' (accompanied by the signatures addressed) to the dispatcher. The numeral '12' at the end of order means 'answer how understood,' and '13' 'we understand to,' etc.

"'When an agent or operator receives an order to hold any train for any purpose, he must carry out the order strictly. Conductors and engine-men will respect such orders, and comply with the same in all cases.'

"The provisions of the first clause were scrupulously followed in setting '337' upon the track, and giving it the time of '50.' Conductor and engineer were addressed by the superintendent, and their written acknowledgment of receipt of his message obtained. Nothing of the kind was done or attempted with the conductor or engineer of train '50.' The starting off of '337' on the time of '50' was, in the absence of such communication or some other precaution, a trap from which the second clause furnished no opportunity of escape. Resort was had to the second clause. Kiefer, the operator, was directed by the superintendent at 4:10, 'hold No. '50' for orders,'

* 91 N. Y. 332.

but there was no information given that '337' was to be put on the track, nor instruction even to exhibit the order to the conductor or engineer on train '50.' The rules do not require it, and the verbal order I have before referred to was given by the operator. For Kiefer's act, in this respect, the defendant is clearly liable. The act he was required to do and did perform was one for which the master was responsible as a duty pertaining to itself, and as to it Kiefer occupied the place of the master. (*Flike* v. *Boston & Albany R. R. Co.*, 53 N. Y. 549; 13 Am. Rep. 545.) The obligation of the master extended to giving notice to the hands on train '50' that train '337' was moving on its time, or giving direction to those hands to stay until '337' arrived. Telling Kiefer to hold the train for orders was a proper step in that direction, but, standing by itself, was not enough. The defendant was to see to it that train '50' was either held or so notified of the 'wild-cat' train that it would move, if at all, at its own peril. This was not done. Kiefer told them to go on, and the second clause of the rules above referred to required the conductor and engineer to respect such order and 'comply with it strictly.'

" The jury might well inquire, among other things, why train '50,' having schedule right to the road, was not notified before another train was ordered to move toward it in a contrary direction, and why the special order for delay in movement was not addressed by the train dispatcher to its conductor and engineer. The intestate might properly look for both, or equivalent precautions, in such emergency as the defendant created. Knowledge of these rules, therefore, implies no contributory negligence on his part.

" The judgment should be reversed, and a new trial granted, with costs to abide the event."

*Thomas Raines* for appellant.

*Edward Harris* for respondent.

DANFORTH, J., reads for reversal and new trial.
All concur.
Judgment reversed.